UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PARTINGTON BUILDERS, LLC,

     Plaintiff,

v.

NAUTILUS INSURANCE CO.,

     Defendant.

No. 22-cv-10040-DLC

**MEMORANDUM AND ORDER ON PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT**

CABELL, U.S.M.J.

This is an action between an insurer and its insured over the scope of coverage of an insurance policy. It arises out of an ongoing underlying state court action regarding the insured's development of a property in Sudbury, Massachusetts (the "underlying action"). The plaintiffs in the underlying action, Simone and Douglas Blowers ("the Blowers"), allege that the plaintiff here, Partington Builders, LLC ("Partington"), removed trees and dirt from their property without their permission. Partington asserts that any liability it may have to the Blowers is covered by its insurance policy with the defendant, Nautilus Insurance Co. ("Nautilus"). Partington seeks a declaratory judgment that the policy covers the claims in the underlying action, as well as an order requiring Nautilus to defend it in the

underlying action and pay Partington's incurred legal fees. Nautilus too seeks a declaratory judgment, that the policy does not cover the claims in the underlying action. Both parties have moved for summary judgment. (Dkt. Nos. 17, 20). For the reasons stated below, the plaintiff's motion is granted in part and denied in part; the defendant's motion is denied.

## I.  **Background**

The facts are undisputed unless otherwise noted. Partington purchased a plot of land in Sudbury to build a house on and sell for profit. (Dkt. No. 19 (Plaintiff's Statement of Material Facts), ¶ 2). The property was adjacent to a lot owned by the Blowers. (Dkt. No. 22 (Defendant's Statement of Undisputed Facts), ¶ 2). The property line between the two lots was drawn in such a way that a triangular portion of the Blowers' property juts out in front of the Partington property. (Dkt. No. 19, ¶ 3; Dkt. No. 22, ¶ 3). While developing its own property, Partington reached out to Douglas Blowers to discuss the possibility of Partington performing certain work on this triangular portion of the Blowers' property. (Dkt. No. 19, ¶ 5; Dkt. No. 22, ¶ 5). Initially, Partington sought permission to remove tree roots from the Blowers' property as part of an effort to remove trees from its own property. (Dkt. No. 22, ¶ 5). Partington also requested permission to remove some small trees and brush from that section of the Blowers' property and regrade the area. (Dkt. No. 19-5, p.

1).  Partington and Douglas Blowers exchanged further emails on the matter.  (*Id.*).  Partington contends that Douglas Blowers authorized the contemplated work, while Nautilus asserts that Blowers only asked for clarification and never consented to the tree removal and regrade.  (Dkt. No. 22, ¶ 9; Dkt. No. 25 (Plaintiff's Response to Defendant's Statement of Undisputed Facts), ¶ 9).

At some point between April 5, 2021, and April 16, 2021, Partington went ahead with the proposed work on the triangular portion of the Blowers' land.  (Dkt. No. 19-5, pp. 3-4).  On April 16, Douglas Blowers sent a cease and desist letter to Partington demanding that Partington restore the property to its "original state."  (*Id.*).

On June 16, 2021, the Blowers brought a state court action against Partington in Middlesex Superior Court, pressing a claim under the Massachusetts tree cutting statute, M.G.L. c. 242, § 7, as well as claims for common-law trespass and nuisance.[1]  (Dkt. No. 19-2).  The complaint takes issue with Partington removing the "natural berm" on the Blowers' property, thereby eliminating the privacy they previously enjoyed.  (*Id.* at ¶¶ 18-22).  The Blowers

---

[1] These claims are described in more detail below.  Briefly, the statutory claim alleges that Partington cut the Blowers' trees without authorization, while the common-law claims allege that Partington entered onto and altered the Blowers' property without authorization.

seek $97,000 to restore the berm, in addition to other unspecified damages.  (*Id.* at ¶¶ 26-28).

At all relevant times, Partington "was insured by Nautilus pursuant to a commercial general liability policy."  (Dkt. No. 22, ¶ 16).  On June 17, 2021, Partington notified Nautilus of the underlying action.  (Dkt. No. 19, ¶ 15).  On July 1, 2021, Nautilus denied coverage under the policy on three grounds:  (1) the complaint did not allege property damage or bodily injury arising from an "occurrence"; (2) the complaint alleges that Partington intentionally damaged the Blowers' property; and (3) the policy excludes coverage for damages arising from the movement of soil. (Dkt. No. 19, ¶ 17).

## II.  **Standard of Review**

"Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020) (quoting Fed. R. Civ. P. 56(a)). A fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The court must view the entire record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor. *Miller v. Sunapee Difference, LLC*, 918 F.3d 172, 176 (1st Cir. 2019).  Where, as here, parties file cross-motions for summary judgment, this posture "do[es] not alter the basic [summary judgment] standard, but rather simply require[s] [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Alasaad v. Mayorkas*, 988 F.3d 8, 16 (1st Cir. 2021) (internal quotation omitted).

"As this case arises in diversity jurisdiction, 'we must apply state substantive law to assess whether summary judgment is appropriate.'" *González-Cabán v. JR Seafood Inc.*, 48 F.4th 10, 14 (1st Cir. 2022) (quoting *López-Santos v. Metro. Sec. Servs.*, 967 F.3d 7, 11 (1st Cir. 2020)).  The parties agree that Massachusetts law applies here, and the court sees no reason to disturb that agreement. *See Conformis, Inc. v. Aetna, Inc.*, --- F.4th ---, 2023 WL 355070, at *3 (1st Cir. 2023) (citing *Borden v. Paul Revere Life Ins. Co.*, 935 F.2d 370, 375 (1st Cir. 1991)) (accepting parties' reasonable choice of controlling law in diversity case).  Under Massachusetts law, the construction of an insurance policy,

as with any contract, is a question of law. *Easthampton Congregational Church v. Church Mut. Ins. Co.*, 916 F.3d 86, 91 (1st Cir. 2019) (internal citations omitted); *see PowerShare, Inc. v. Syntel, Inc.*, 597 F.3d 10, 14 (1st Cir. 2010) ("interpreting a contractual term [is] a question of law for the courts"). Such "a question of law [is] appropriate for resolution by summary judgment." *Fernandes v. AGAR Supply, Inc.*, 687 F.3d 39, 42 (1st Cir. 2012) (quoting *Afarian v. Mass. Elec. Co.*, 866 N.E.2d 901, 905 (Mass. 2007)).

## III.  Discussion

### A.  The Duty to Defend and the Duty to Indemnify

This action raises questions about two duties that insurers may owe to their insureds: the duty to defend and the duty to indemnify.  Nautilus expressly took on both duties through the policy it issued to Partington:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

(Dkt. No. 1-1, p. 21).  Plainly, Nautilus must defend and indemnify Partington for covered losses, but not for uncovered losses.  *See Vt. Mut. Ins. Co. v. Poirier*, 189 N.E.3d 306, 310 (Mass. 2022) ("If the language of an insurance policy is unambiguous, then we

construe the words in their usual and ordinary sense") (internal quotation omitted).  Where the two duties differ is in the approach each requires for determining whether a loss is "covered."

An insurer has a duty to defend its insured in an action when the allegations against the insured, as stated in the complaint, "are reasonably susceptible of an interpretation that they state or adumbrate a claim covered by the policy terms."  *Ruggerio Ambulance Serv., Inc. v. Nat'l Grange Ins. Co.*, 724 N.E.2d 295, 298 (Mass. 2000) (internal quotation omitted); *see Billings v. Commerce Ins. Co.*, 936 N.E.2d 408, 414 n.6 (Mass. 2010) (replacing antiquated word "adumbrate" with "roughly sketch").  The inquiry turns on the nature of the claim rather than the likelihood of success, and even a weak or frivolous claim can trigger the duty to defend.  *Metro. Prop. and Cas. Ins. Co. v. Morrison*, 951 N.E.2d 662, 668 (Mass. 2011); *see Utica Mut. Ins. Co. v. Fontneau*, 875 N.E.2d 508, 512 (Mass. App. Ct. 2007) (citing *Simplex Techs., Inc. v. Liberty Mut. Ins. Co.*, 706 N.E.2d 1135, 1137 (Mass. 1999)) (noting that duty to defend arises out of allegations that give rise to a "possibility of recovery," not a "probability of recovery").  Likewise:

> [t]he process is not one of looking at the legal theory enunciated by the pleader but of envisaging what kinds of losses may be proved as lying within the range of the allegations of the complaint, and then seeing whether any such loss fits the expectations of protective insurance reasonably generated by the terms of the policy.

*Billings*, 936 N.E.2d at 415 (internal quotations omitted).  "Any uncertainty as to whether the pleadings include or are reasonably susceptible to an interpretation that they include a claim covered by the policy terms is resolved in favor of the insured." *Deutsche Bank Nat'l Ass'n v. First Am. Title Ins. Co.*, 991 N.E.2d 638, 642 (Mass. 2013).

The duty to indemnify, unlike the duty to defend, "depends on actual facts, rather than allegations." *OneBeacon Am. Ins. Co. v. Narragansett Elec. Co.*, 31 N.E.3d 1143, 1156 (Mass. App. Ct. 2015). Whereas the duty to defend turns on the allegations in a complaint, even if those allegations are implausible, the duty to indemnify turns on the truth underlying such allegations.  In this sense, "[a]n insurer's duty to defend is broader than its duty to indemnify." *Bagley v. Monticello Ins. Co.*, 720 N.E.2d 813, 817 (Mass. 1999).

At a hearing on this motion, the parties agreed that it would be premature for the court to make a finding on Nautilus's purported duty to indemnify at this stage, as the existence of that duty will turn on the determination of the facts in the underlying action, which is still pending.[2]  The court agrees with this reasoning and will thus reserve its ruling as to whether

---

[2] Of course, if Nautilus did not owe Partington a duty to defend, then there would necessarily be no duty to indemnify. *See Bagley*, 720 N.E.2d at 817.

Nautilus must indemnify Partington until after the underlying action is resolved.[3]   The inquiry for the moment, then, is whether Nautilus owes Partington a duty to defend it in the underlying action.  Under the "in for one, in for all" rule, if Nautilus has a duty to defend any count of the complaint in the underlying action, then it must defend every count.  *See GMAC Mortg., LLC v. First Am. Title Ins. Co.*, 985 N.E.2d 823, 827 (Mass. 2013).

### B.  Occurrence Requirement

By its express terms, the insurance policy between Nautilus and Partington "applies to 'bodily injury' and 'property damage' only if . . . [t]he 'bodily injury' or 'property damage' is caused by an 'occurrence.'"  (Dkt. No. 1-1, p. 21).  The policy defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.* at p. 35).   "Under Massachusetts law, an 'accident' is commonly defined as 'an unexpected happening without intention or design.'"  *Hanover Ins. Grp., Inc. v. Raw Seafoods, Inc.*, 73 N.E.3d 831, 835 (Mass. App. Ct. 2017) (quoting *Liberty Mut. Ins. Co. v. Tabor*, 553 N.E.2d 909, 912 (Mass. 1990)).  Massachusetts courts construe the term broadly in insurance policies.   *Id.* (citing *Quincy Mut. Fire Ins. Co. v. Abernathy*, 469 N.E.2d 797, 799 (Mass. 1984)).  Notably, "an injury which ensues from the volitional act

---

[3] This approach seems especially prudent given that, if Partington prevails in the underlying action, there will be no loss for Nautilus to indemnify, rendering the issue moot.

of an insured is still an 'accident' within the meaning of an insurance policy if the insured does not specifically intend to cause the resulting harm or is not substantially certain that such harm will occur." *Worcester Ins. Co. v. Fells Acre Day Sch., Inc.*, 558 N.E.2d 958, 964 (Mass. 1990) (internal quotation omitted). Even reckless conduct is generally considered accidental in this context. *Id.* at 970.

At the outset, then, Nautilus has a duty to defend Partington if at least one of the allegations in the underlying action reasonably sketches a claim in which the Blowers' injury arose out of an accident on Partington's part, as defined under Massachusetts law. The court thus turns to the individual allegations.

> 1. *Tree-Cutting Statute*

In their complaint, the Blowers allege that Partington, "without authority or permission, removed trees from the property of [the Blowers]," in violation of M.G.L. c. 242, § 7. (Dkt. No. 19-2, ¶ 33-34). The statute provides that:

> A person who without license willfully cuts down, carries away, girdles or otherwise destroys trees, timber, wood or underwood on the land of another shall be liable to the owner in tort for three times the amount of the damages assessed therefor; but if it is found that the defendant had good reason to believe that the land on which the trespass was committed was his own or that he was otherwise lawfully authorized to do the acts complained of, he shall be liable for single damages only.

M.G.L. c. 242, § 7.  The Blowers' request for relief on this count includes "[t]reble damages as allowed under the statute."  (Dkt. No. 19-2, ¶ 35(c)).   Nautilus argues that, because these allegations focus on Partington willfully removing the Blowers' trees without authorization, they preclude any finding that Partington accidentally violated the statute.  This is not so.

To begin, the tree-cutting statute does not in and of itself foreclose the possibility that a violation can arise from an accident.  As previously discussed, an "accident" for present purposes includes an intentional act that is not meant or substantially certain to cause harm.  *Fells Acre Day Sch.*, 558 N.E.2d at 964.  A person who intentionally cuts down trees without license incurs liability (for single damages) even if he "had 'good reason to believe' he was 'lawfully authorized' to do so."  *Evans v. Mayer Tree Serv., Inc.*, 46 N.E.3d 102, 109-10 (Mass. App. Ct. 2016).  It stands to reason that a person who reasonably believes that he is lawfully authorized to cut down trees is not substantially certain that cutting the trees will harm another.

Regarding the allegations in the underlying action, nowhere in the complaint do the Blowers allege that Partington definitively knew or should have known that it did not have a license to cut trees on the Blowers' property.  The Blowers only allege that they never authorized Partington to cut any trees and that Partington cut the trees anyway.  *See* (Dkt. No. 19-2, ¶¶ 17-18).  They describe

and include Douglas Blowers's email to Wayne Partington in which Blowers said he was "ok with the details about the scope of the work" but needed further details and assurances about the quality of the work.  (*Id.* at ¶¶ 13-14).  Although the Blowers will likely argue that Partington lacked a good reason to believe that it was authorized to cut the trees, so as to recover treble damages, the complaint embraces the possibility that Partington, even if mistaken, had a good reason to believe it was authorized to cut the trees, but nevertheless violated the statute.

All that the complaint alleges is that Partington removed trees from the Blowers' property "without authority or permission."  (*Id.* at ¶ 33).  This allegation describes equally well the tortfeasor who knows he has no right to remove the trees as well as the tortfeasor who mistakenly believes he has permission to remove them.  The latter case would be an "occurrence" because the tree-cutter who believes he has permission to cut trees is not substantially certain that cutting those trees will injure the property owner.  *See Fells Acre Day Sch.*, 558 N.E.2d at 964.  In the court's view, the allegations here are broad enough to reasonably sketch a claim that Partington had a mistaken but reasonable belief that it was authorized to cut the trees.  Such a claim would be for property damage arising out of an occurrence, meaning it would be a "loss [that] fits the expectation of protective insurance reasonably generated by the terms of the

policy," thus triggering Nautilus's duty to defend.  *See Billings*, 936 N.E.2d at 415.

Nautilus attempts to escape this conclusion through multiple avenues.  First, Nautilus argues that the Blowers' request for treble damages necessarily means that the allegations are limited to intentional, as opposed to accidental, conduct.  The court disagrees.  Under the tree cutting statute, a plaintiff need not specifically request treble damages or assert that a defendant did not have a good reason to believe he was authorized to cut the trees in order to recover treble damages.  Rather, such a request is essentially implied in every action under the tree cutting statute and a plaintiff who establishes liability thereunder is automatically entitled to treble damages, unless the defendant thereafter can show that he had reason to believe that the land on which the trespass was committed was his own or that he was otherwise lawfully authorized to do the challenged acts.  *Snelling v. Garfield*, 114 Mass. 443, 443 (1874); *accord Ritter v. Bergmann*, 891 N.E.2d 248, 255 (Mass. App. Ct. 2008).  As this paradigm applies regardless of whether a plaintiff has (or has not) requested treble damages, it is immaterial that the Blowers happened to request treble damages here, and their request does not foreclose a finding that Partington had a good reason to believe it was authorized to cut the trees, in which case its conduct would be accidental, and so covered under the policy.

13

Second, Nautilus asserts that, given the facts presented, Partington could not have reasonably believed that it was authorized to cut the Blowers' trees.   In Nautilus's view, Partington acted unreasonably by neither confirming its purported authorization with Douglas Blowers nor seeking clarification before cutting the trees.   But Nautilus's view on whether Partington acted reasonably is not germane.   Rather, Nautilus's duty to defend turns on whether the complaint reasonably sketches a claim that Partington accidentally cut the trees.   As discussed, the Blowers' complaint is broad enough to include a claim that Partington violated the statute after making a good faith mistake.

Finally, Nautilus points to *Pacific Indem. Co. v. Lampro* for the proposition that it is not an "accident" when a contractor hired to remove some trees fails to follow directions and cuts more trees than requested.   *See Pacific Indem. Co. v. Lampro*, 12 N.E.3d 1037, 1042-43 (Mass. App. Ct. 2014).   In *Lampro*, the court found that, "in the landscaping trade, 'the possibility that unintended trees may be cut is clearly a normal, foreseeable, and expected incident of doing business,' and not a 'fortuitous event for which liability insurance was designed.'"   *Id.* at 1043.   The situation here is meaningfully different, though.   No one alleges that Partington was authorized to cut *some* of the trees on the Blowers property but not others.   The allegation is that Partington was never authorized to cut any trees at all.   Thus, this is not

14

a case, as in *Lampro*, where a contractor simply exceeded the scope of work it was already hired and authorized to perform.  Whatever its instructive value, *Lampro* does not mandate a finding here that the tree cutting on the Blowers' property was not an accident.

In sum, the allegations in the Blowers' complaint regarding Partington's purported violation of M.G.L. c. 242, § 7 reasonably sketch a claim arising out of an accident or occurrence because they are broad enough to cover a scenario in which Partington had a good faith but mistaken belief that it was authorized to cut the trees.  These allegations alone are enough to trigger Nautilus's duty to defend.  *See GMAC Mortg., LLC*, 985 N.E.2d at 827.  In the interests of thoroughness, however, the court goes on to examine whether the trespass and nuisance claims embrace a potential occurrence, and thus trigger the duty to defend.

   2.  *Trespass and Nuisance*

Counts II and III of the Blowers' complaint assert claims for trespass and nuisance, respectively.  (Dkt. No. 19-2, ¶¶ 36-41).  Recognizing that the two counts use nearly identical language, and following the lead of the parties, the court addresses these two claims together.  The thrust of the allegations is substantially similar to the allegations underlying the claim under M.G.L. c. 242, § 7: that Partington "entered upon the [Blowers'] land without permission or authorization and removed earth, arborvitae, trees,

shrubs and destroyed the natural earth berm that existed between the two properties." (Dkt. No. 19-2, ¶ 37).

Nautilus argues that, because "[u]nder Massachusetts law, there is no trespass liability for unintentional, non-negligent acts," Partington's alleged trespass cannot possibly be the product of an accident or occurrence. (Dkt. No. 21, p. 9). But Nautilus's argument confuses an intentional act with an intended result. It is black-letter law that "an unintended intrusion upon the land in possession of another does not constitute a trespass." *Edgarton v. H.P. Welch Co.*, 74 N.E.2d 674, 679 (Mass. 1947) (finding plaintiff did not commit trespass when out-of-control truck he was riding drove into utility pole). However, one may commit a trespass "by mistake" by voluntarily entering another's property "without actual intent to invade [the] property." *J. D'Amico, Inc. v. City of Boston*, 186 N.E.2d 716, 720 (Mass. 1962). This sort of mistaken trespass constitutes an "accident" for insurance purposes. *Id.* at 720-21.[4]

Three examples may help to illustrate these pertinent distinctions. Consider two abutting grass lots, one a public park and the other private property, where the border between the two lots is marked by a visible line of pebbles. In the first example,

---

[4] Nautilus urges the court to ignore *D'Amico* because the case is 60 years old and rarely cited on the issue of accidental trespass. (Dkt. No. 29, p. 2). Neither of these objections in any way detract from the fact that *D'Amico* remains good law.

an individual is walking in the park near the boundary line when a strong wind blows him over and causes him to tumble onto the adjoining private property.  This individual did not trespass on the private property because he did not enter the property of his own volition.  In the second scenario, another individual walking in the park sees some roses growing on the private property and walks over to smell them without seeing or realizing that she has crossed over the boundary line of pebbles.  She has trespassed on the private lot because her actional was volitional, but her trespass is accidental because she thought she was allowed to walk where she did.  Finally, in the last example an individual walking in the park also sees the roses and like the second person walks over to the same spot to smell them.  Unlike the second person, though, he sees the pebbles and understands that he is exiting the park and entering the private lot.  This individual has also trespassed, but his trespass is "intentional" rather than accidental.  Although the individual entered onto private property without permission in all three instances, the first two examples would be "occurrences," the first because the entry was completely unintentional and unexpected, *see Hanover Ins. Grp., Inc.*, 73 N.E.3d at 835, and the second because the parkgoer was not substantially certain that she was invading another's property. *See Fells Acre Day Sch.*, 558 N.E.2d at 964.

As with the tree-cutting, the allegations in the Blowers' complaint reasonably sketch a claim in which Partington held a mistaken belief that it was authorized to enter onto the Blowers' property and then entered the property to perform what was ultimately unauthorized work.  Such an intentional entry would be a trespass, but it would be one predicated on a mistake, making it an accident for present purposes.  *See J. D'Amico*, 186 N.E.2d at 720-21.  As such, the trespass allegations against Partington also arise out of an occurrence and thus trigger Nautilus's duty to defend.

### C.  Exclusion A — Expected or Intended Injury

To be sure, Nautilus contends that, even if the Blowers' claims against Partington do arise out of an occurrence, certain exclusions in the policy place the claims firmly outside the policy's scope.  The first of these asserted exclusions is for "Expected Or Intended Injury," which provides, in relevant part, that the policy "does not apply to . . . '[b]odily injury' or 'property damage' expected or intended from the standpoint of the insured."  (Dkt. No. 1-1, p. 22).  According to Nautilus, this exclusion applies because "Partington willfully destroyed trees and the berm on the Blowers land . . . [and] clearly understood at the time that these intentional acts would have physical consequences for the property on which they were undertaken."  (Dkt. No. 21, p. 10).

18

As with its analysis on the trespass claim, Nautilus again conflates an intentional act with an intended result. *See Hanover Ins. Co. v. Talhouni*, 604 N.E.2d 689, 691 (Mass. 1992) ("The focus in these cases is whether the insured 'intended' the injury, not whether the insured 'intended' the act."). Everyone agrees that Partington intended to remove trees and earth from the Blowers' property, but that does not mean that Partington intended or expected that the removal would injure the Blowers. The removal would have physical consequences, certainly; all landscaping does. However, Partington clearly believed that those consequences would be beneficial to the Blowers. Moreover, as previously discussed, the Blowers' complaint reasonably sketches a claim that Partington mistakenly believed that the Blowers had consented to the removal work. Nautilus fails to explain how, under those circumstances, Partington should have expected that the removal would injure the Blowers.[5] As such, the Expected or Intended Injury exclusion does not relieve Nautilus of its duty to defend.

---

[5] In its attempt to fit this exclusion to the facts at hand, Nautilus cites to a case in which an insured, who was "stoned" after smoking marijuana, punched another individual multiple times and kicked him once in the face. *Liberty Mut. Fire Ins. Co. v. Casey*, 74 N.E.3d 285, 289 (Mass. App. Ct. 2017). There, the exclusion applied notwithstanding the insured's intoxication because the facts showed that the insured clearly intended to assault the individual and because such an assault would obviously be expected to cause bodily injury. *Id.* at 289-90. These facts are far afield from those in the present action. Removing trees and dirt, unlike kicking someone in the face, is not necessarily intended or expected to cause injury.

### D.  Exclusions J.5 and J.6 – Damage to Property

Nautilus also raises two related exclusions carving out certain categories of property damage from the policy.  The first, which the parties refer to as "J.5," excludes coverage for "'[p]roperty damage' to . . . [t]hat particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations."  (Dkt. No. 1-1, pp. 24-25).  The second, "J.6," excludes "'[p]roperty damage to . . . [t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it."  (*Id.*).  The argument here is that, because the Blowers' claims derive from the landscaping operations Partington performed on their property, the damage to the property arises out of Partington's operations and is thus excluded.  Although this argument has some appeal on its face, it elides an important point about the character of Partington's operations.

Taking J.6 first, the court notes that Nautilus posits that it only intends to assert the J.6 exclusion as an alternative to J.5 if Partington attempts to defeat J.5 by arguing that trees are not "real property."  (Dkt. No. 21, pp. 12-13).  As Partington makes no such argument, J.6's applicability is moot.  Even if Nautilus were to argue that J.6 should apply in any case, Nautilus fails to develop this argument in its briefing.  *See* (*id.* at p.

13) (asserting without explanation that "Exclusion J.6 would apply" and otherwise noting only that "Exclusion J.6 has regularly been upheld by Massachusetts courts.").  Accordingly, the court does not consider the issue further.  *See Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 260 (1st Cir. 1999) ("The district court is free to disregard arguments that are not adequately developed.").

Turning then to J.5, Nautilus discusses three cases that allegedly support applying the exclusion here.  In the first, a contractor submitted two claims to its insurer for water damage to a building it constructed caused by acts of an employee and a subcontractor.  *E.H. Spencer   Co., LLC v. Essex Ins. Co.*, No. 0600135, 2009 WL 2231222, at *1 (Mass. Super. Ct. May 27, 2009).  The insurer denied coverage based on exclusions identical to J.5 and J.6.  *Id.*  The court agreed that the exclusions applied, noting that the contractor "was hired to build the dwelling in question [and] [t]he entire structure was under [the contractor's] command."  *Id.* at *3.  In the second case, J.5 excluded coverage for repair work to a newly built elementary school, incidental to repairs to a faulty concrete slab, in part because the insured was hired to build the entire school, not just the slab.  *Mello Constr., Inc. v. Acadia Ins. Co.*, 874 N.E.2d 1142 (Mass. App. Ct. 2007) (unpublished).  Finally, Nautilus points to *Lampro*, which it states "is on all fours with this claim."  (Dkt. No. 21, p. 12).

As previously discussed, the contractor in *Lampro* caused significant property damage by cutting more trees than it was supposed to cut. *Lampro*, 12 N.E.3d at 1040. The plaintiff, seeking to recover from the contractor's insurer, argued that J.5 and J.6 did not apply because the contractor exceeded the scope of its permits. *Id.* at 1043. The court disagreed, finding that the contractor was authorized to perform a variety of work throughout the property, and that, in any case, the exclusion would apply to the entire property as long as the contractor was retained to work on some part of it. *Id.* (citing *Jet Line Servs., Inc. v. Am. Emps. Ins. Co.*, 537 N.E.2d 107, 111 (Mass. 1989).

These cited cases share one commonality that meaningfully differentiates them from the case at bar. In each of the three cases, the excluded property damage arose out of work that the insured was authorized, indeed, hired, to perform. In fact, this is true of every case Nautilus cites in connection with J.5 or J.6. *See B&T Masonry Constr. Co. v. Pub. Serv. Mut. Ins. Co.*, 382 F.3d 36, 37 (1st Cir. 2004); *Mills Constr. Corp. v. Nautilus Ins. Co.*, Civil Action No. 18-10549-IT, 2019 WL 1440404, at *1 (D. Mass. Mar. 31, 2019); *Lusalon, Inc. v. Hartford Accident and Indem. Co.*, 511 N.E.2d 595, 596 (Mass. 1987); *Bond Bros., Inc. v. Robinson*, 471 N.E.2d 1332, 1333 (Mass. 1984); *Donovan v. Com. Union Ins. Co.*, 692 N.E.2d 536, 537 (Mass. App. Ct. 1998). Even in *Lampro*, where the insured cut certain trees without authorization, it

mattered that the insured was authorized to work on at least some part of the property. *Lampro*, 12 N.E.3d at 1043. The situation here is inapposite. The basis for the Blowers' claims against Partington is exactly that Partington was *not* authorized to work on the property. *See Lampro*, 12 N.E.3d at 1043 ("[W]e distinguish between improper work performed by the insured that damages the property of a party to the contract[] and damage done to a third-party."). In light of this, and bearing in mind that uncertainties should be resolved in favor of the insured, *Deutsche Bank Nat'l Ass'n,* 991 N.E.2d at 642, the court cannot and does not find that J.5 operates to exclude coverage here.[6]

## E.  Subsidence Exclusion

Finally, Nautilus asserts that an exclusion for "subsidence" precludes coverage here insofar as the Blowers' claims arise from Partington removing earth from the property.[7] The exclusion provides as follows:

> This insurance does not apply to "bodily injury," "property damage," "personal and advertising injury," or medical payments directly or indirectly arising out of, resulting from, contributed to, aggravated or concurrently caused by "subsidence or movement of soil, land, bedrock or earth," whether natural, manmade or otherwise.

---

[6] Further, in every case Nautilus cites (with the possible exception of *Lampro*), the property damage is a result of defective workmanship. Here, as Partington points out, the problem is not that Partington did a shoddy job removing the trees and earth, but that it did the work at all. *See* (Dkt. No. 27, p. 4).

[7] Nautilus asserted this exclusion in its initial denial of coverage but did not raise it in its motion for summary judgment. Because Partington raises the exclusion in its own motion, the court addresses the issue here.

> We have no duty to defend any insured against any loss,
> claim, "suit," or other proceeding alleging damages
> arising out of or related to "bodily injury," "property
> damage," "personal and advertising injury" or medical
> payments to which this exclusion applies.

(Dkt. No. 1-1, p. 49).  The exclusion also supplies the following definition:

> "Subsidence or movement of soil, land, bedrock or earth"
> includes, but is not limited to settling, bulging,
> shaking, sinking, slipping, shifting, eroding, rising,
> tilting, expanding, contracting, shrinking,
> instability, falling away, caving in, landslide,
> mudflow, flood, sinkhole, earthquake, volcano, or
> avalanche.

(*Id.*).  Partington argues that this exclusion is limited to unintended shifting of earth and does not apply to the intentional removal of earth from the Blowers' property.  The court agrees.

Although the exclusion explicitly encompasses "manmade" "subsidence or movement of soil, land, bedrock or earth," the policy language is unclear as to whether "movement," as it is used here, includes intentionally moving earth, as with a shovel or backhoe.  The many verbs included in the policy's definition of subsidence all connote a sort of spontaneous movement, and the list notably does not include any clear description of an intentional carrying away of earth.  As such, the exclusion is facially ambiguous as to whether it includes Partington's removal of earth from the Blowers' property.

When a policy provision's meaning is ambiguous, the court construes the provision based on "what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." *Clark Sch. for Creative Learning, Inc. v. Phila. Indem. Ins. Co.*, 734 F.3d 51, 57 (1st Cir. 2013) (quoting *Bos. Gas Co. v. Century Indem. Co.*, 910 N.E.2d 290, 305 (Mass. 2009)). Common definitions of subsidence uniformly indicate a shifting or settling of earth rather than an intentional movement of earth. *See, e.g.*, *Subsidence*, *Black's Law Dictionary* (2d ed. 1910) ("The land of insured property that is able to shift for a number of reasons."); *Subsidence*, Oxford English Dictionary, https://www.oed.com/view/Entry/193001 (last visited Jan. 31, 2023) ("The more or less gradual sinking or caving in of an area of ground due to geological forces, mining operations, etc."); *Subsidence*, Cambridge Dictionary, https://dictionary.cambridge.org/dictionary/english/subsidence (last visited Jan. 31, 2023) ("the process by which land or buildings sink to a lower level"). Further, the court sees no reason why Partington should reasonably expect that its general liability policy would cover damages arising out of, for example, cutting the grass or trimming hedges but not digging a hole to plant or remove a tree. As such, given the ambiguity in the policy language, the court finds that the exclusion does not cover the intentional carrying away of soil, and thus does not apply here.

**F.  Partington's Defense Costs and Attorney's Fees**

Having reached the end of the parties' arguments, the court finds that the Blowers' allegations against Partington reasonably sketch a claim covered by the policy, meaning that Nautilus has a duty to defend Partington going forward in the underlying action. There remain, however, two issues to resolve regarding the costs Partington has incurred up to this point.

An insurer's duty to fund the defense of its insured is triggered when the insured provides notice of the claim to the insurer. *Rass Corp. v. Travelers Cos., Inc.*, 63 N.E.3d 40, 47 (Mass. App. Ct. 2016). Relatedly, "an insurer who has committed a breach of its contractual duty to defend its insured is liable 'for the natural consequences of [the] breach of contract that places its insured in a worse position.'" *Liquor Liab. Joint Underwriting Ass'n of Mass. v. Hermitage Ins. Co.*, 644 N.E.2d 964, 968 (Mass. 1995) (quoting *Polaroid Corp. v. Travelers Indem. Co.*, 610 N.E.2d 912, 922 (Mass. 1993)) (alteration in original). Here, Partington notified Nautilus of the Blowers' complaint the day after it was filed, thus triggering Nautilus's duty to defend. Nautilus breached that duty by disclaiming coverage and refusing to defend Partington. Partington has since incurred costs defending itself in the underlying action, putting it in a worse position than it would have been if Nautilus had assumed its defense from the start. Accordingly, in order to restore

Partington to the position it should have been in all along, Nautilus must pay Partington's defense costs in the underlying action incurred from June 17, 2021 (the day Nautilus received notice of the underlying action) to the present.

Nautilus's breach has also caused Partington damages beyond its defense costs in the underlying action to the extent Partington was compelled to bring this action to enforce Nautilus's duty to defend. "It is well established that an insured is entitled to recover reasonable attorney's fees and expenses incurred in successfully establishing the insurer's duty to defend under the terms of the policy." *John T. Callahan & Sons, Inc. v. Worcester Ins. Co.*, 902 N.E.2d 923, 924 (Mass. 2009) (citing *Preferred Mut. Ins. Co. v. Gamache*, 686 N.E.2d 989, 993 (Mass. 1997). As such, in addition to reimbursing Partington for its defense costs in the underlying action, Nautilus must also reimburse Partington for its reasonable attorney's fees and expenses incurred in litigating this action.

## IV. <u>Conclusion</u>

For the foregoing reasons, Partington's motion for summary judgment (Dkt. No. 17) is GRANTED as to Nautilus's duty to defend and DENIED without prejudice as to its duty to indemnify. Nautilus's motion for summary judgment (Dkt. No. 20) is DENIED as to its duty to defend and DENIED without prejudice as to its duty

to indemnify.   The court will stay the remainder of this case pending the resolution of the underlying action.


<u>So Ordered</u>.                          <u>/s/ Donald L. Cabell</u>
                                    DONALD L. CABELL, U.S.M.J.

DATED: February 3, 2023